In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 15-2849

ROBERTO G. ALAMO,

*Plaintiff-Appellant,*

*v.*

CHARLIE BLISS, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-04327 — **Sharon Johnson Coleman**, *Judge.*

———————————

ARGUED NOVEMBER 10, 2016 — DECIDED JULY 20, 2017

———————————

Before RIPPLE, MANION, and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* This case arises from a series of incidents that occurred while Roberto Alamo, the plaintiff, was a Chicago firefighter. The operative complaint contains claims against the City of Chicago, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and against Lieutenant Charlie Bliss, under 42 U.S.C. § 1983, for various forms of discrimination on the basis of national origin; a failure to accom-

modate claim against the City, under the Americans with Dis-
abilities Act ("ADA"); and two state tort claims against the
City and Captain Stefan. The City of Chicago, Lieuten-
ant Bliss, and Captain Stefan moved to dismiss for failure to
state a claim under Federal Rule of Civil Procedure 12(b)(6).
The district court granted the motion, dismissing all of
Mr. Alamo's federal claims with prejudice and declining to
exercise supplemental jurisdiction over his state law claims.

Mr. Alamo asks us to reverse the district court's dismissal
of his complaint. He contends that he sufficiently pleaded a
hostile work environment claim, a disparate treatment claim,
and a retaliation claim against the City under Title VII, and a
hostile work environment claim against Lieutenant Bliss un-
der 42 U.S.C. § 1983. We agree, and, for the reasons set forth
in this opinion, we reverse the district court's dismissal and
remand this case for further proceedings.[1]

# I

## BACKGROUND

### A.

Mr. Alamo began his service as a firefighter in the Chicago
Fire Department in 2006. According to the allegations of his
complaint, in 2009, shortly after his transfer to Engine Com-

---

[1] We have jurisdiction to decide this appeal under 28 U.S.C. § 1291. Mr. Al-
amo is not appealing the dismissal of his ADA claim or the district court's
decision to decline supplemental jurisdiction over his Illinois assault and
battery claims. Appellant's Br. 11 n.10.

pany 55, other firefighters began verbally and physically harassing him. The complaint asserts that firefighters called him "spic" and "f--king Puerto Rican."[2] It also describes incidents involving firefighters stealing Mr. Alamo's food or throwing his food away. This treatment began in 2009 and "continu[ed] throughout 2010 and 2011."[3] Mr. Alamo also alleges that the number of times on which he was "detailed," or assigned to work at different locations, was excessive when compared to the assignments given to his non-Latino colleagues during the same time.[4]

Mr. Alamo complained to his immediate supervisor, Lieutenant Bliss, about this treatment. According to the complaint, Mr. Alamo brought these concerns to Lieutenant Bliss's attention in July, August, and November of 2010, and again in April, July, and August of 2011. Lieutenant Bliss did not remedy the behavior. The complaint details a handful of specific incidents that occurred after Mr. Alamo initially complained to Lieutenant Bliss. For example, in March 2011, fellow firefighter Dan Sheahan made derogatory comments to Mr. Alamo about his Puerto Rican national origin and then physically assaulted him. Mr. Alamo alleges that he again complained to Lieutenant Bliss following the incident. He also alerted Battalion Chief Curt Annis, but asserts that nothing was done to remedy the discrimination.

The complaint also details a September 13, 2011 incident. On that day, Mr. Alamo reported to work but was not feeling

---

[2] R.86 at 4.

[3] *Id.* at 3.

[4] *Id.* at 4.

well due to allergies and informed Lieutenant Bliss and a colleague that he would be in the television room and might be sleeping. About an hour later, Captain Stefan, a captain on a different truck from Mr. Alamo's, woke Mr. Alamo up, yelled profanities at him, and stated, "I don't like your kind, you better put in a transfer and get out of this firehouse because I don't want you here."[5] Captain Stefan then chest bumped Mr. Alamo, used more profanity, and threatened further physical violence.

Later that day, Captain Stefan again pushed Mr. Alamo against a wall, an incident witnessed by Lieutenant Bliss. Mr. Alamo called 911 for assistance and spoke to police officers when they arrived, but he did not press charges. Mr. Alamo alleges that he did not take the matter further because he received a call from Chief Chickorotis, the Fire Chief assigned to Engine 42 Headquarters, who "pleaded with Alamo" to wait for him to arrive before doing anything.[6] When Chief Chickorotis arrived, he repeatedly asked Mr. Alamo not to bring charges and to let him resolve the incident without involving the police. Chief Chickorotis also said that he would help Mr. Alamo with the harassment at the firehouse if Mr. Alamo did not press charges. Mr. Alamo agreed, but asked the police to document the incident with Captain Stefan.

Later that evening, Chief Chickorotis brought Mr. Alamo to a different firehouse and they met privately. Chief Chickorotis asked Mr. Alamo, "What can we do to make this all go

---

[5] *Id.* at 4–5 (internal quotation marks omitted).

[6] *Id.* at 5.

away?"[7] Mr. Alamo said he wanted the Fire Department to "do the right thing."[8] Chief Chickorotis became angry and said he was done talking to him. Mr. Alamo later learned that the responding police officers had a private meeting with Captain Stefan, Chief Chickorotis, and others, and that the police report was inaccurate.

On the next day, September 14, 2011, at 6:00 a.m., Mr. Alamo ended his shift and took the bus home. Mr. Alamo exited the bus after a few blocks because he was experiencing chest pain, dizziness, and a migraine. He called a friend to pick him up and take him to the hospital where he explained to an emergency room physician that he had been chest bumped and pushed at work the day before. The physician diagnosed him with a work-related chest contusion, work-related stress, and possibly post-traumatic stress disorder. Mr. Alamo met with his primary care physician the next day; he referred Mr. Alamo to a psychologist and a psychiatrist and ordered medical leave due to the incident with Captain Stefan.

That same day, Mr. Alamo reported to the Chicago Fire Department that he was beginning medical leave. At that time, Sylvia Tienda was the Medical Section Chief and had authority to decide whether firefighters could return to work after medical leave. Ms. Tienda told Mr. Alamo she would not consider his injury work-related, and the Chicago Fire Department would not pay for any hospital or medical treatment because he did not report the incident while on duty.

---

[7] *Id.* at 6 (internal quotation marks omitted).

[8] *Id.*

On March 13, 2012, after Mr. Alamo had been on medical leave for six months, Ms. Tienda informed Mr. Alamo that his medical leave was expiring and that he would need to get a release from his treating physician to return to duty.[9] The next day, Mr. Alamo met with his treating physician, who gave him written authorization to return to work without restrictions. On March 16, when Mr. Alamo gave Ms. Tienda this authorization, she requested new information, including a prescription for a functional capacity evaluation. Mr. Alamo obtained the prescription and delivered it to Ms. Tienda on March 19. A few days later, on March 21, another employee in the Medical Section, Dr. Issac Morcos, told Mr. Alamo that he needed progress notes from all of his treating physicians before clearing him to return to work. Mr. Alamo's treating physicians forwarded their progress notes on March 22 and March 26, 2012.

On March 26, Ms. Tienda confirmed receipt of these documents. The same day, Mr. Alamo met with his union representative "regarding why the [Chicago Fire Department] would not allow him to return to work when he had been cleared by his treating physicians."[10] On March 30, 2012, Mr. Alamo filed an inquiry with Ms. Tienda about his work status and received a response from her on April 3, 2012. That day, Mr. Alamo learned, for the first time, of another requirement: he needed to provide medical records dating back to 2009 and undergo further medical evaluation, including two

---

[9] Mr. Alamo learned that day that Ms. Tienda "had calculated his furloughs improperly" and that he had an additional sixty-eight days of medical leave. *Id.* at 8.

[10] *Id.*

days of psychological tests, before he could be cleared for work. The next day, April 4, 2012, Mr. Alamo filed a charge against the Chicago Fire Department with the U.S. Equal Employment Opportunity Commission.

After that filing, on April 19, 2012, Ms. Tienda scheduled Mr. Alamo for a two-part psychological test on May 1 and 24, 2012. Mr. Alamo attended the May 1 session, but was told by the doctor's office that the Chicago Fire Department would be in touch with Mr. Alamo regarding the second session because the May 24 date had to be rescheduled.

On May 8, another doctor in the Chicago Fire Department's Medical Section asked Mr. Alamo "for several more medical records dating back several years."[11] Mr. Alamo, now represented by counsel, asked about the necessity of these records and when the second part of the testing would take place. Over the course of the next month, Mr. Alamo's attorney asked the Medical Section several more times why the additional records were needed, what else Mr. Alamo needed to provide, and when the second day of testing would be scheduled. The attorney received no response. On June 4, 2012, Mr. Alamo filed this lawsuit.[12]

On July 3, 2012, Mr. Alamo received a letter from Adrianne Bryant, the Fire Department's Deputy Commissioner of Human Resources, explaining that his leave time was exhausted and that, if he did not return to work, resign, or go on a leave of absence, he would be designated as "absent

---

[11] *Id.* at 9.

[12] The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

without authorized leave."[13] On July 6, 2012, the Fire Department stopped paying Mr. Alamo his salary and benefits. Several months later, however, Mr. Alamo was reinstated as a firefighter. Mr. Alamo contends that non-Latino firefighters did not face these hurdles after medical leave.

## B.

This case comes to us on Mr. Alamo's third amended complaint. That complaint sets forth three Title VII national-origin discrimination claims against the City: a hostile work environment claim; a disparate treatment claim; and a retaliation claim. The complaint also includes a hostile work environment claim against Lieutenant Bliss under 42 U.S.C. § 1983; a failure to accommodate claim under the ADA against the City; and two state tort claims against the City and Captain Stefan. The defendants moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

On July 28, 2015, the district court granted the motion. It dismissed all of Mr. Alamo's federal claims with prejudice and declined to exercise supplemental jurisdiction over his state law claims. The court concluded that the allegations in Mr. Alamo's complaint did not allege "severe or pervasive" harassment, as required to state a hostile work environment claim.[14] With respect to Mr. Alamo's Title VII disparate treatment and retaliation claims, the court ruled that both claims

---

[13] R.86 at 10 (internal quotation marks omitted).

[14] R.111 at 8.

failed because neither "detailing" nor "hurdles and chal-
lenges" in returning to work constituted adverse employment
actions and because Mr. Alamo "failed to allege any causal
link between his reports of harassment to Bliss and the subse-
quent actions of the medical section personnel."[15]

## II

## DISCUSSION

We review de novo the district court's decision to dismiss
a complaint for failure to state a claim under Federal Rule of
Civil Procedure 12(b)(6). *Abcarian v. McDonald*, 617 F.3d 931,
933 (7th Cir. 2010). In our review, we must "accept as true all
factual allegations in the amended complaint and draw all
permissible inferences in [the plaintiff]'s favor." *Bible v. United
Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). A
complaint will survive a motion to dismiss for failure to state
a claim if it "contain[s] sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.
v. Twombly*, 550 U.S. 544, 570 (2007)). That is, "[w]hile a plain-
tiff need not plead detailed factual allegations to survive a
motion to dismiss, she still must provide more than mere la-
bels and conclusions or a formulaic recitation of the elements
of a cause of action for her complaint to be considered ade-
quate." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)
(internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at
678).

---

[15] *Id.* at 10–12.

Having stated the general principles that govern our inquiry, we now apply these principles to the particular circumstances of this case. We first address Mr. Alamo's hostile work environment claims under Title VII and Section 1983; we then turn to his Title VII disparate treatment and, finally, his Title VII retaliation claim.

## A.

Title VII forbids an employer

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … national origin[.]

42 U.S.C. § 2000e-2(a)(1). Mr. Alamo may establish a violation of Title VII by proving that he was subjected to a hostile work environment. As the Supreme Court explained in *Harris v. Forklift Systems Inc.*, this statutory language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). To state a hostile work environment claim based on national origin, a plaintiff must allege that: (1) he "was subject to unwelcome harassment"; (2) "the harassment was based on [his] national origin"; (3) "the harassment was severe or pervasive so as to

alter the conditions of employment and create a hostile or abusive working environment"; and (4) "there is basis for employer liability." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833–34 (7th Cir. 2015).[16] In determining whether a workplace is objectively hostile, we consider the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[T]he specific circumstances of the working environment and the relationship between the harassing party and the harassed" also "bear on whether that line is crossed." *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003). Still, this liability has limitations, and Title VII was not designed to become a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Instead, although a workplace need not be "hellish" to constitute a hostile work environment, *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007), a hostile work environment must be "so pervaded by discrimination that the terms and conditions of

---

[16] A plaintiff may assert a concomitant employment discrimination Title VII and 42 U.S.C. § 1983 claim. *Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49 (1974) ("The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination."). When a plaintiff uses § 1983 as a parallel remedy to a Title VII hostile work environment claim, the elements needed to establish liability are the same under both statutes. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 835 (7th Cir. 2015) (citing *Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 192 (1st Cir. 2003)).

employment [a]re altered," *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013).

The complaint contains several allegations which, taken together, sufficiently state hostile work environment claims under both Title VII and § 1983. First, Mr. Alamo asserts that he was subjected to "name-calling, derogatory and racist comments" by his co-workers between 2009 and September 2011.[17] There is no "magic number" of instances or type of slur that indicates a hostile work environment. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("*Cerros I*") (internal quotation marks omitted).[18] Instead, we look to the "pervasiveness and severity" of language used, which we have described as being "inversely related." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) ("*Cerros II*"). A "severe episode" that occurs "as rarely as once" and a "relentless pattern of lesser harassment" both may violate Title VII. *Id.* (internal quotation marks omitted).

Mr. Alamo recalls two specific racial slurs ("spic" and "f--king Puerto Rican") that were directed at him.[19] Although the complaint lacks detail regarding the frequency of the comments, both slurs are severe: each evinces a clear animus against a particular national origin. Thus, even if the slurs

---

[17] R.86 at 4.

[18] *See also Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 671–73 (7th Cir. 1993) (finding an actionable hostile work environment when supervisors and employees referred to an employee by a racial slur between five and ten times).

[19] R.86 at 4.

were used only sporadically over the two-year period detailed in the complaint, they must factor into our analysis. The complaint also contains allegations that Mr. Alamo was bothered enough by the comments, as well as other incidents in the firehouse, that he informed Lieutenant Bliss "on numerous occasions, including in July, August and November of 2010, and April, July and August of 2011, of the harassment that he endured from his fellow firefighters."[20] Despite these repeated complaints, Lieutenant Bliss did not ameliorate the conditions of Mr. Alamo's workplace.

The complaint also makes clear that these slurs were just *part* of the harassment that Mr. Alamo faced. The complaint also alleges that Mr. Alamo notified Battalion Chief Annis and Lieutenant Bliss of "several incidents" of his food being thrown out of the fridge or being stolen by co-workers.[21] The defendants characterize these allegations as the sort of "trivial" incidents not covered by Title VII.[22] But that misunderstands the Supreme Court's standard, which requires that we consider the *totality* of Mr. Alamo's factual allegations and the work environment in which they happened. *See Harris*, 510 U.S. at 23. Combined with the verbal abuse endured by Mr. Alamo, the complaint suggests that these incidents were based on his national origin and contributed to a multifaceted effort to harass Mr. Alamo. It is also significant that the harassment occurred in an atmosphere where firefighters live and serve together and in which mutual interdependence is

---

[20] *Id.*

[21] *Id.*

[22] Appellees' Br. 22.

an essential factor in effectiveness and, at times, survival. Unit cohesion is as important in a firefighting unit as it is on a battlefield or aboard a man-of-war.[23]

Notably, the complaint also describes two physical altercations that occurred in the firehouse; Mr. Alamo alleges that both were motivated by his national origin. The first of these incidents occurred in March 2011. The complaint states that a coworker, "firefighter Dan Sheahan, … directed racist and derogatory comments regarding Alamo's Puerto Rican national origin and verbally harassed and physically assaulted Alamo."[24] Mr. Alamo told Lieutenant Bliss about the incident, but the complaint states that Lieutenant Bliss did nothing to address the harassment. A second physical altercation occurred in September 2011. The complaint details how Captain Stefan woke Mr. Alamo up, yelled profanities at him, and stated "I don't like your kind, you better put in a transfer and get out of this firehouse because I don't want you here."[25] Captain Stefan then chest bumped Mr. Alamo, used more profanity, and threatened further physical violence. Later that day, Mr. Alamo again was pushed against a wall by Captain

---

[23] *Cf. Anderson v. Burke Cty., Ga.*, 239 F.3d 1216, 1222 (11th Cir. 2001) (explaining that a fire department "has a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers" (internal quotation marks omitted)); *Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015) (recognizing "a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department").

[24] R.86 at 4.

[25] *Id.* at 4–5 (internal quotation marks omitted).

Stefan, an incident which he claims that Lieutenant Bliss witnessed.[26]

The district court did not consider the September 2011 incident in its analysis because Mr. Alamo "left the workplace for medical leave less than 24-hours after the encounter,"[27] which, in its view, deprived the Chicago Fire Department of taking the appropriate action. We respectfully disagree. In considering only the complaint at this stage, it was far too premature for the district court to conclude that the City could not have taken remedial action. In any event, even *without* the September 2011 incident, there were sufficient allegations in the complaint to state a hostile work environment claim. We are required at this stage to credit Mr. Alamo's allegations that his coworkers used offensive slurs, stole his food, and

---

[26] The City's suggestion that it cannot be held liable for Captain Stefan's actions because he was not Mr. Alamo's supervisor is wide of the mark. Even if we assume that, despite his rank, Captain Stefan cannot be considered a supervisor, *Jajeh v. Cty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012), the City of Chicago still may be liable if Mr. Alamo can establish that the City was negligent in discovering and remedying the harassment, *id.*; *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). According to the allegations of the complaint, Captain Stefan's alleged assaults were reported to Chief Chickorotis and, at least in one instance, witnessed by Lieutenant Bliss. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758–59 (1998).

The complaint does not specify whether Chief Chickorotis was Mr. Alamo's reporting senior, but it does allege adequately that this officer assumed, at one point, authority and responsibility for rectifying the situation involving Captain Stefan.

[27] R.111 at 8 n.2 (citing *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005)).

physically threatened him over a two-year period. We also are obliged to accept, for purposes of adjudicating this dismissal, Mr. Alamo's allegations that he routinely complained to his supervisors of mistreatment and that those supervisors did nothing to curb the ongoing harassment he faced.[28] Surely these allegations, if true, plausibly state that Mr. Alamo endured a hostile work environment. Indeed, the complaint details exactly the type of "sever[e]" language and "physically threatening" circumstances that the Supreme Court described as hostile in *Harris*, 510 U.S. at 23. We therefore conclude that Mr. Alamo stated a hostile work environment claim against the City and against Lieutenant Bliss.

## B.

We turn next to Mr. Alamo's disparate treatment claim. To establish a Title VII disparate treatment claim, a plaintiff must allege that an employer took job-related action against him which was motivated by intentional discrimination. *See Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016). The district court dismissed Mr. Alamo's disparate treatment claim and his related retaliation claim because, in its view, the complaint did not allege that the Chicago Fire Department had taken an adverse employment action against Mr. Alamo. The City also disputes whether the complaint alleges that any such action was the result of a protected characteristic.

---

[28] This is particularly true given that "little information is required to put [an] employer on notice" of a discrimination claim because employers are "familiar" with such claims and thus should "know how to investigate them." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014).

We have described an adverse employment action as "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000) (alteration in original) (internal quotation marks omitted). Such actions include: (1) diminishing an "employee's compensation, fringe benefits, or other financial terms of employment," including termination; (2) reducing long-term career prospects "by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted"; and (3) changing "the *conditions* in which [an employee] works … in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (emphasis in original).

Mr. Alamo contends that being "detailed excessively" during his employment and the "needlessly piece-meal" investigation that the Department took when he sought to return from medical leave constitute adverse employment actions.[29] First, regarding "detailing," Mr. Alamo contends that he was assigned to work at different locations excessively and specifically asserts that "similarly situated white employees of the City" did not experience the same treatment.[30] Although Mr. Alamo does not state how often he was detailed,

---

[29] Appellant's Br. 23 (quoting R.86 at 4); *id.* at 27. Mr. Alamo describes detailing as a "brief assignment to a different location." *Id.* at 23 (internal quotation marks omitted).

[30] R.86 at 13.

the complaint, read in its entirety, alleges that Mr. Alamo was targeted for less desirable assignments. As we have recognized, an adverse employment action may be "unique to a particular situation." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013); *see Parrett v. City of Connersville, Ind.*, 737 F.2d 690, 693 (7th Cir. 1984) (discussing that employee was "given a windowless room to sit in that formerly had been a storage closet" and that the employee "spent his shift sitting at the desk with nothing to do").[31]

We believe that it is premature to conclude that excessively "detailing" Mr. Alamo did not result in an adverse employment action. When evaluated in context with Mr. Alamo's other allegations, these assignments can be construed as a tool to marginalize or stigmatize Mr. Alamo within the Department. It also may be that being "detailed" made it difficult for Mr. Alamo to continue to perform his job at the same level, or may impact Mr. Alamo's long-term career prospects. We therefore conclude that, in the context of this case, the allegations regarding excessive "detailing" plausibly state an adverse employment action. In any event, when combined with the allegation that Mr. Alamo did not receive a salary or benefits for a period after his medical leave ran out, a suffi-

---

[31] In *Lavalais v. Village of Melrose Park*, for example, we recognized that a police officer described a "constructive demotion" when his "assignment to the midnight shift for an indefinite period of time stripped him of his authority as a sergeant, significantly diminished his job responsibilities, and caused him to be 'virtually powerless' as a sergeant." 734 F.3d 629, 634–35 (7th Cir. 2013). We also have recognized "constructive discharge" claims where forced idleness was used to humiliate and marginalize an employee. *See Parrett v. City of Connersville, Ind.*, 737 F.2d 690, 694 (7th Cir. 1984).

cient claim of disparate treatment certainly is stated. Diminishing an employee's compensation on the basis of national origin is an adverse employment action under Title VII. *Herrnreiter*, 315 F.3d at 744.

The complaint provides specific allegations of how the gap in reinstatement was caused by the City. Following the incident with Captain Stefan, Mr. Alamo took medical leave at the recommendation of his physicians. Six months later, on March 13, 2012, Ms. Tienda informed Mr. Alamo that his medical leave was expiring and that he would need to obtain a release from his treating physician to return to duty. Mr. Alamo was cleared by his physician, who gave him written authorization to return to work. The Medical Section then requested additional information, including an authorization for a functional capacity evaluation. Mr. Alamo obtained that prescription and provided it to Ms. Tienda.

A few days later, Mr. Alamo was informed of a new requirement. At that time, Mr. Alamo was told that the Medical Section needed progress notes from all of his treating physicians before clearing him to return to work. Mr. Alamo complied with this request and his physicians sent their notes on March 22 and March 26, 2012, which Ms. Tienda confirmed that she received. Shortly thereafter, on March 30, 2012, Mr. Alamo filed an inquiry with Ms. Tienda about his work status. In Ms. Tienda's April 3, 2012 response, Mr. Alamo learned for the first time of yet another requirement: he needed to provide medical records dating back to 2009 and undergo additional testing, including two days of psychological evaluation.

On April 19, 2012, Ms. Tienda scheduled Mr. Alamo for a two-part psychological test to take place on May 1 and 24,

2012. After the May 1 session, Mr. Alamo was asked to provide more medical records by a different physician in the Department's Medical Section. Mr. Alamo, now represented by counsel, asked about "the necessity of these additional medical records."[32] Over the next month, Mr. Alamo's counsel continued to ask for clarification. The Fire Department did not respond to these requests.

On July 3, 2012, Mr. Alamo received a letter from the Fire Department's human resources deputy commissioner explaining that his leave time was exhausted and that if he did not return to work, resign, or go on a leave of absence, in about two weeks he would be designated as "absent without authorized leave."[33] Unable to return because of the ongoing medical inquiry, the Fire Department stopped paying Mr. Alamo his salary and benefits on July 6, 2012.[34]

Mr. Alamo emphasizes that these "hurdles were imposed in a needlessly piece-meal, and needlessly incrementally onerous manner."[35] He claims that "[f]or each [hurdle] he cleared, a new one appeared, more onerous than the last."[36] Such a pattern, Mr. Alamo asserts, is consistent with making compliance impossible, and differentiates these allegations

---

[32] R.86 at 9.

[33] *Id.* at 10 (internal quotation marks omitted).

[34] Several months later, Mr. Alamo was reinstated.

[35] Appellant's Br. 27.

[36] *Id.*

from what otherwise might have been a legitimate investigation into Mr. Alamo's medical fitness.[37] The complaint also clearly connects this treatment to Mr. Alamo's protected status, claiming that "other, non-Latino firefighters have not been subjected" to these types of "hurdles, obstacles, and challenges in their attempts to return to work after a medical leave of absence."[38]

We recognize that there may be a lawful explanation for the Chicago Fire Department's conduct. After all, fire departments are a "special work environment" and medical evaluations, including psychiatric evaluations, may be considered "job-related and consistent with business necessity." *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 566 (7th Cir. 2009) (observing that fire departments have the "obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtless mentally and physically demanding work"). But dismissing Mr. Alamo's claim at this stage would be shortsighted. Mr. Alamo does not complain that the Chicago Fire Department should not have undertaken *any* investigation into his fitness to serve; rather, the complaint describes an investigation that was so onerous that it could not be completed in the nearly four-month period between Ms. Tienda's initial inquiry and the expiration of Mr. Alamo's medical leave. *In the context of Mr. Alamo's other allegations*, we conclude that the complaint plausibly attrib-

---

[37] *Id.* at 25–27 (discussing *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009); *Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir 2010)).

[38] R.86 at 10.

utes the piecemeal and onerous process to Mr. Alamo's national origin. It therefore states a claim for disparate treatment against the City under Title VII.

## C.

We now turn to Mr. Alamo's retaliation claim. To state a claim for retaliation under Title VII, a plaintiff must allege that he "engaged in statutorily protected activity" and suffered an adverse action[39] "as a result of that activity." *Huri*, 804 F.3d at 833.

The district court dismissed Mr. Alamo's retaliation claim because it believed that the complaint did not allege that the Chicago Fire Department had taken an adverse employment action against Mr. Alamo. We, however, already have stated our contrary conclusion; the complaint makes clear that Mr. Alamo did not receive any salary or benefits for a brief period after his medical leave ran out. *See Herrnreiter*, 315 F.3d at 744.

In addition to the claim that the Department processed his return in a needlessly onerous way due to his national origin,

---

[39] "The range of conduct prohibited under [Title VII's] anti-retaliation provision is broader than its anti-discrimination provision." *Henry v. Milwaukee Cty.*, 539 F.3d 573, 586 (7th Cir. 2008). In the context of a retaliation claim, "'the discriminatory acts proscribed by Title VII … are not limited to those that affect the terms and conditions of one's employment.'" *Id.* (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007)). Here, because Mr. Alamo clearly alleges an adverse *employment* action under Title VII's anti-discrimination provision, *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002), we need not consider the full breadth of Title VII's prohibition on retaliation.

the complaint offers a second, very specific explanation for the prolonged investigation, which clearly connects the adverse action to protected activity. The complaint explains that, after the violent altercation with Captain Stefan, Mr. Alamo called 911 in order to file a police report regarding the incident. Mr. Alamo's ability to report what he viewed as workplace discrimination clearly is protected activity under Title VII.[40] *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001) (concluding that plaintiff's decision to file a police report "constitutes protected activity under Title VII"); 42 U.S.C. § 2000e-3(a) (listing protected activities, including "oppos[ing] any practice made an unlawful employment practice" by Title VII).[41]

Before the police arrived, however, Chief Chickorotis called Mr. Alamo and pleaded with him not to involve the police. Indeed, Chief Chickorotis allegedly went so far as to go to Mr. Alamo's firehouse that evening to dissuade Mr. Alamo

---

[40] As previously discussed, the complaint asserts that this altercation was motivated by Mr. Alamo's national origin. Specifically, during the altercation, the complaint states that Captain Stefan shouted "I don't like your kind" at Mr. Alamo. R.86 at 4 (internal quotation marks omitted). Whether these comments actually "went so far as to violate Title VII does not matter" in our present analysis. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). Instead, because Mr. Alamo "sincerely and reasonably believed [he] [was] complaining about conduct prohibited by Title VII," that is sufficient "to establish protected activity." *Id.*

[41] *See also id.* (holding that filing a complaint with a human resources manager constituted protected activity); *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015) (describing filing EEOC charges as "the most obvious form of statutorily protected activity"). Indeed, "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

from reporting the incident. In exchange, Mr. Alamo claims that Chief Chickorotis offered to help him with the harassment at the firehouse. This help, however, only would be given *if* Mr. Alamo did not escalate the situation with Captain Stefan. Mr. Alamo agreed not to press charges, but insisted on filing an accurate police report. Later, when asked by Chief Chickorotis what the Department could do "to make this all go away," Mr. Alamo asked for the Department to "do the right thing."[42] This made Chief Chickorotis angry. The Chief then stated that he was "done talking" to Mr. Alamo.[43]

The City asserts that the lengthy gap between Mr. Alamo's decision to file a police report and the allegedly prolonged investigation weakens any inference of causation. An inference of retaliation can be weakened by "a lengthy time period between the protected activity and the alleged retaliation." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014). For example, "[i]f the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." *Id.* (citing *Carmody v. Bd. of Tr. of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014)). Still, we have admonished that "no bright-line timing rule" should be used to decide whether a retaliation claim is plausible. *Id.* at 829.

Here, the complaint sets forth good reason for the gap between the report and the allegedly retaliatory conduct: between the incident with Captain Stefan and the onerous process to return to work, Mr. Alamo was on medical leave from his position due to injuries inflicted by Captain Stefan. In

---

[42] R.86 at 6 (internal quotation marks omitted).

[43] *Id.*

other words, it was not until Mr. Alamo attempted to return to the Chicago Fire Department, when his medical leave was about to expire, that the Department had its first opportunity to retaliate against him for reporting the incident with Captain Stefan. The delay in retaliatory activity therefore cannot be used to suggest a break in the causal chain. Moreover, based on Chief Chickorotis's rank, it also is plausible that the Chief had authority to take action affecting Mr. Alamo's return to work.

Because we conclude that the complaint sufficiently sets forth a protected activity, an adverse employment action, and a causal link to protected conduct, we conclude that Mr. Alamo has stated a retaliation claim against the City under Title VII.

## Conclusion

For the reasons set forth in the foregoing opinion, we reverse the district court's dismissal of Mr. Alamo's Title VII and § 1983 claims and remand for proceedings consistent with this opinion.

REVERSED and REMANDED